## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

Yvette Griffin, on behalf of herself and
all others similarly situated,

            Plaintiff,

    v.

ROI Capital LLC, and Matthew Larson,

           Defendants.

CASE NO.  2:25-cv-11460

CLASS ACTION COMPLAINT

<u>JURY TRIAL DEMANDED</u>

### Nature of this Action

1.     Yvette Griffin ("Plaintiff"), individually and on behalf of all others similarly situated, bring this class action against ROI Capital LLC ("ROI") and Matthew Larson (together, "Defendants") under the Telephone Consumer Protection Act ("TCPA").

2.     Upon information and belief, Defendants routinely violate 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2) by delivering more than one advertisement or marketing text message to residential or cellular telephone numbers registered with the National Do-Not-Call Registry ("DNC Registry") without the prior express invitation or permission required by the TCPA.

### Parties

3.     Ms. Griffin is a natural person who resides in the City of Eastpointe, County of Macomb, and State of Michigan.

4.    ROI is an Iowa limited liability company that runs a marketing and real estate business headquartered in Milan, Illinois, but primarily based in Iowa.

5.    Mr. Larson is the sole owner and manager of ROI, and is a self-proclaimed real estate investor and wholesaler.

6.    Mr. Larson is a resident of Bettendorf, Iowa.

## Jurisdiction and Venue

7.    This Court has subject matter jurisdiction under 47 U.S.C. § 227(c)(5), and 28 U.S.C. § 1331.

8.    Venue is proper before this Court under to 28 U.S.C. § 1391(b)(2) as Plaintiff resides in this district and a significant portion of the transactions giving rise to this action occurred in this district.

9.    In particular, Defendants directed their text messages to Plaintiff's telephone in this district, and Plaintiff received those messages in this district.

## Factual Allegations

10.    Plaintiff is, and has been at all times relevant to this action, the regular and sole user of her cellular telephone number—(313) 282-XXXX.

11.    Plaintiff uses her cellular telephone as her personal residential telephone number.

12.    In 2003, the Federal Communications Commission ("FCC") ruled that cellular telephone numbers that are placed on the DNC registry are presumed to be

2

residential. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003).

13.     Plaintiff registered her cellular telephone number with the DNC Registry on December 14, 2004, and has maintained that registration through the present date.

14.     Starting in February 2025, Plaintiff received at least four text messages from (213) 386-0044 or (313) 447-1573, seeking to solicit Plaintiff to "turn [her] equity into cash" and either sell her home or use the seller's services in the sale of her home:



15.     Plaintiff did not recognize the sender, is not selling her home, and was not looking to sell her home.

16.     Plaintiff did not request any real estate services discussed in the subject text messages.

17.     Upon information and belief, ROI is a real estate investor that seeks to solicit homeowners to sell their property to ROI, or use ROI's real estate services in a real estate property sale transaction.

18.     In doing so, ROI offers to purchase homeowners' properties for cash, offering to take care of all aspects of the transaction to facilitate a quick transaction without the need for a real estate agent or MLS listing.

19.     Upon information and belief, in exchange for providing these services, ROI pays substantially below fair market value for the homes it seeks to purchase, and thereafter remarkets the property to third-party investors or purchasers.

20.     In other words, ROI is a real estate wholesaler, which is a commonly-used strategy to (1) persuade a homeowner to sell their home to the wholesaler at a substantial discount below fair market value, in exchange for a suite of services to ease the sale, then (2) prior to completing the purchase, remarket the property to third-party purchasers or investors, in order to (3) assign or sell the contract to that investor for a substantial premium, thereby allowing the investor to step into ROI's shoes and acquire the house instead, with the difference in price solely allocated to ROI as profit, instead of the homeowner.

21.     As explained by Mr. Larson, "wholesaling" is "find[ing] a house that

you can buy at a discount and make and [sic] an offer that gets accepted (usually at a big discount)" where you then "find a cash buyer and either sell them your signed contract (Assignment) or you buy and sell the home on the same day (Double Close)."[1]

22.    ROI's barebones website—https://www.realestatematt.com/opt-in-real-estate-matt-1—represents that the entity offers an opportunity to "SELL YOUR HOUSE FAST With ROI CAPITAL LLC" and that, in doing so, "We'll handle all necessary repairs. We buy houses in 'As Is' Condition. Get an all CASH offer now! We close rapidly. No closing costs. No realtors. No hassles."

23.    That URL is, itself, a part of https://www.realestatematt.com/, a website which promotes Mr. Larson's real estate wholesaling education business, real estate software packages, and services to automate real estate transactions and acquisitions through the use of virtual assistants provided by Mr. Larson.

24.    In other words, Mr. Larson seeks to provide operational support to third parties to "automate" real estate wholesaling, by way of cold-calling campaigns in open disregard of the TCPA and the DNC Registry.

25.    Mr. Larson touts his credibility by noting that he is actively engaging in this process: "I've done over 4000 real estate deals in my 18-year career. Not a

---

[1]     https://www.youtube.com/watch?v=ltIcV0h1vnc (last visited May 13, 2025).

decade ago... Not 2 years ago... I'm doing deals right now."[2]

26.     Upon information and belief, Mr. Larson does these "deals right now" through ROI.

27.     Defendants maintain a number of other websites, including https://www.mattneedshouses.com/, where ROI (and Mr. Larson) purport to help homeowners sell their houses' fast, and, upon information and belief, will handle everything necessary to effectuate the sale.

28.     Additionally, Defendants will provide real estate advice to homeowners even if they do not choose to transact with Defendants.[3]

29.     Upon information and belief, ROI seeks to supplant the role of a traditional real estate agent while providing the same services as a real estate agent, and in exchange for doing so, is compensated by obtaining a homeowner's property at a reduced price, and thereafter selling it at an inflated price.

30.     As part of these efforts, ROI necessarily offers to pair numerous services offered by a real estate agent—appraising the fair market value of the property, arranging for title and escrow services, and finding interested third-party purchasers, akin to a conventional real estate agent—with its communications to Plaintiff.

---

[2]     https://www.realestatematt.com/ (last visited May 13, 2025).

[3]     https://www.facebook.com/share/1BUqApyhRh/ (last visited May 16, 2025).

31.     As a result, ROI would be (and, upon belief and information, is) compensated for its services in an analogous manner to a real estate agent: after providing services to facilitate the transaction, it receives compensation from the proceeds related to the buying or selling of a home.

32.     In other words, although Defendants may suggest that such appraisal, escrow, title, and marketing services are "free," those services are, instead, baked into the discount Defendants offer for the property, by reducing their offers to homeowners in exchange for those services, and thereafter either (1) assigning the contract to purchase the property at that discounted rate to a third-party purchaser for a fee; or (2) purchasing the property at the discounted rate and then reselling it *the very same day* to a third-party purchaser for its "true" value, collecting all of the profit for Defendants, rather than the homeowner.

33.     On his Instagram page, Mr. Larson exemplifies this through his promotion of virtual assistants—which he provides—to negotiate down purchase prices in his agreements with the consumers that Defendants contact via their telemarketing campaign:[4]

---

[4]     https://www.instagram.com/stories/highlights/17944867900812280/     (last visited May 16, 2025).

7



This VA Will Take Your Existing
Seller Leads, Negotiate Them
Down to an Offer Amount
That You Choose, and Get
Contracts Signed, all While
Following our "Two-Call"
System.

**_Learn More in Bio!_**



34.     In fact, Mr. Larson touts that in his wholesaling endeavors, he touts doing thousands of assignment or resale deals with average assignment fees around $17,000 or $18,000.[5]

35.     In that same video, Mr. Larson touts acquiring and then assigning 252 real estate properties in Detroit in a single day.[6]

36.     Mr. Larson even touted that, when he contacted homeowners in

---

[5]     https://youtu.be/Ja-sRPjoFq8?si=60CSoVkBg37-vSrb&t=1372 (last visited May 13, 2025).

[6]     *Id.*

vulnerable financial situations to acquire their property for resale or reassignment, it was "like taking candy from a baby."[7]

37.     Plaintiff did not give ROI prior express consent or prior express written consent to send text messages to her cellular telephone number.

38.     In fact, Defendants implicitly acknowledge the lack of consent in their communications—which inquire as to whether Plaintiff was interested in engaging in a real estate transaction without Plaintiff first expressing interest—and via numerous materials disclosed by Mr. Larson.

39.     For example, Mr. Larson's virtual assistant automation service for real estate marketing touts—"This VA can buy homeowner lists, skip trace for phone numbers, and market to them with texts, direct mail, and ringless voicemail, all on Autopilot."—or for cold-calling: "This VA can buy homeowner lists, skip trace for phone numbers, and make up to 12,000 cold call dials per month, all on Autopilot."[8]

40.     Mr. Larson continues to tout this real estate cold-call text messaging campaign in explicit detail, encouraging stating "[s]imply put...sending texts to homeowners can radically increase the number of houses you buy and sell," and

---

[7]     https://youtu.be/QNFYAtr6CY0?si=MaX3xkpgFJkZAwIc&t=726     (last visited May 13, 2025).

[8]     https://www.rapidassistants.com/ (last visited May 13, 2025).

offering "Guaranteed lead flow: On average for 5000 texts you can expect to receive 25-50 leads, ensuring a steady stream of potential leads for your business."[9]

41.    He, through one of his other entities, even offers "data packages" of skip-traced records, which he touts as "the best data available backed by the power of A.I. to target the homeowners looking to sell now."[10]

42.    Mr. Larson also expressly discusses how to optimize cold-calling results through his methodology.[11]

43.    This includes using services touted by Mr. Larson to "direct skip seller leads" by filtering real estate records based on various criteria, including criteria such as indicia that the owner maybe behind on mortgage payments or tax payments:[12]

---

[9]    https://www.rapidassistants.com/TextingOnDemand (last visited May 13, 2025).

[10]    https://www.rapidassistants.com/SkiptracedDataOptions (last visited May 13, 2025).

[11]    https://www.instagram.com/p/DGNuA65zt10/ (last visited May 13, 2025).

[12]    https://youtu.be/UJtKp25m7Gc?si=M1QUbUzE1AR3IJuv&t=439        (last visited May 13, 2025).

| Property Address | Property City | Property State | Property Zip | Property Type | Owner Occupied | Assd Total Value | Market Total Value | Tax Delinquent Year | Total Sq. Ft. | Year Built | Effective Year Built | Number Of Residential Units |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11413 KALTZ AVE | WARREN | MI | 48089 | | No | $10,870.00 | $21,740.00 | 0 | 0.00 | | | 0.0 |
| 7519 STUDEBAKER AVE | WARREN | MI | 48091 | Single Family Residential | Yes | $28,390.00 | $56,780.00 | 2017 | 1474.00 | 1940 | 1940 | 0.0 |
| 8054 STUDEBAKER AVE | WARREN | MI | 48089 | Single Family Residential | Yes | | $55,520.00 | 0 | 1157.00 | 1936 | 1936 | 0.0 |
| 8212 HUDSON AVE | WARREN | MI | 48089 | Single Family Residential | Yes | $30,490.00 | $60,980.00 | 0 | 1242.00 | 1930 | 1930 | 0.0 |
| 8081 RIVARD AVE | WARREN | MI | 48089 | Single Family Residential | Yes | $26,310.00 | $52,620.00 | 2015 | 953.00 | 1952 | 1952 | 0.0 |
| 28338 LORRAINE AVE | WARREN | MI | 48093 | Single Family Residential | Yes | $82,570.00 | $165,140.00 | 0 | 1148.00 | 1958 | 1958 | 0.0 |
| 8226 DODGE AVE | WARREN | MI | 48089 | Single Family Residential | Yes | $29,370.00 | $58,740.00 | 0 | 0.00 | 0 | 0 | 0.0 |

| | | |
|---|---|---|
| Bathrooms: | Is Exactly | |
| Lot Size: | Is Exactly | |
| Number Of Residential Units: | Is Exactly | |
| Number Of Commercial Units: | Is Exactly | |
| Vacant: | | |

**– OWNER INFORMATION FILTERS**

| | | |
|---|---|---|
| Owner Occupied: | | |
| Corporate Owned: | | |
| Years Owned: | Is Exactly | |
| Is Tax Delinquent: | | |
| Tax Delinquent Year: | Is Exactly | |

**+ SALE INFORMATION FILTERS**

44.     Mr. Larson's video proceeds to explain that, once these criteria are applied, a user (such as ROI) would skip-trace those results to begin a telemarketing campaign absent prior express written consent.

45.     In another interview, Mr. Larson explains in detail his use of harassing cold-call communications via conventional mail, ringless voicemails, and text messages, using skip-traced leads tied to suspected homeowners of properties he is interested in acquiring, irrespective of any prior express written consent or the homeowner's status on the DNC Registry.[13]

46.     In blunt terms, Defendants are engaging in widespread and brazen violations of the TCPA, and Mr. Larson is actively encouraging others to do so, and

---

[13]     https://youtu.be/QNFYAtr6CY0?si=8o9V02f2Ty61CADS&t=3569     (last visited May 13, 2025).

seeks to further profit from facilitating such wanton telemarketing that the TCPA was expressly intended to prevent.

47.    The text messages at issue were sent for non-emergency purposes.

48.    Upon information and belief, the text messages at issue were sent by Defendants voluntarily.

49.    The purpose of the text messages at issue was to advertise and to market Defendants' businesses or services.

50.    Additionally, upon information and belief, Defendants also collect motivated seller consumer data and resells that information to investors, including by way of executing assignment contracts.

51.    As a result, Defendants either (1) solicited Plaintiff to sell her home to them at a discount in order for Defendants to resell or Plaintiff's home, or (2) solicited Plaintiff to submit their information to Defendants' lead generation service and, if Plaintiff expressed an interest in selling her home, Defendants would then sell that via an assignment contract to investors for a profit.

52.    Plaintiff did not give Defendants prior express invitation or permission to send advertisement or marketing text messages to her cellular telephone number.

53.    Plaintiff suffered actual harm as a result of the text messages at issue in that she suffered an invasion of privacy, an intrusion into her life, and a private nuisance.

54.     Upon information and belief, Defendants knew, or should have known, that Plaintiff registered her cellular telephone number with the DNC Registry.

55.     Mr. Larson is the sole owner and manager of ROI, and, as detailed above, is intimately aware of, and controls, the outbound cold-calling operations of both ROI and, presumably, numerous other entities.

56.     Mr. Larson also purported to send the text message at issue himself.

57.     Therefore, Mr. Larson is the beneficiary of ROI's conduct, and upon information and belief, given his control of all aspects of ROI's operations, he also enacted ROI's campaign of telemarketing without obtaining consent.

## Class Action Allegations

58.     Plaintiff brings this action under Federal Rule of Civil Procedure 23, and as representatives of the following class (the "Class"):

> All persons throughout the United States (1) to whom ROI Capital LLC or Matt Larson delivered, or caused to be delivered, more than one text message within a 12-month period, promoting ROI Capital LLC's, or their business partners' goods or services, (2) where the person's residential or cellular telephone number had been registered with the National Do Not Call Registry for at least thirty days before ROI Capital LLC or Matt Larson delivered, or caused to be delivered, at least two of the text messages within the 12-month period, (3) within four years preceding the date of this complaint through the date of class certification.

59.     Excluded from the Class are Defendants, ROI's officers and directors, members of their or Mr. Larson's immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants

have or had a controlling interest.

60.   Upon information and belief, the members of the Class are so numerous that joinder of all of them is impracticable.

61.   The exact number of members of the Class is unknown to Plaintiff at this time, and can be determined only through appropriate discovery.

62.   The members of the Class are ascertainable because the Class is defined by reference to objective criteria.

63.   In addition, the members of the Class are identifiable in that, upon information and belief, their telephone numbers, names, and addresses can be identified in business records maintained by Defendants, and by third parties, including members of the Class.

64.   Plaintiff's claims are typical of the claims of the members of the Class.

65.   As they did for all members of the Class, Defendants sent solicitation text messages to Plaintiff's telephone number more than thirty days after Plaintiff registered her cellular telephone number with the DNC Registry.

66.   Plaintiff's claims, and the claims of the members of the Class originate from the same conduct, practice, and procedure on the part of Defendants.

67.   Plaintiff's claims are based on the same theories as are the claims of the members of the Class.

68.    Plaintiff suffered the same injuries as the members of the Class.

69.    Plaintiff will fairly and adequately protect the interests of the members of the Class.

70.    Plaintiff's interests in this matter are not directly or irrevocably antagonistic to the interests of the members of the Class.

71.    Plaintiff will vigorously pursue the claims of the members of the Class.

72.    Plaintiff has retained counsel experienced and competent in class action litigation.

73.    Plaintiff's counsel will vigorously pursue this matter.

74.    Plaintiff's counsel will assert, protect, and otherwise represent the members of the Class.

75.    The questions of law and fact common to the members of the Class predominate over questions that may affect individual members of the Class.

76.    Issues of law and fact common to all members of the Class include:

   a.    Defendants' practice of sending text messages, for solicitation purposes, to telephone numbers already registered on the DNC Registry for more than thirty days;

   b.    Mr. Larson's responsibility and role in ROI's delivery of telemarketing text messages to telephone numbers already

registered on the DNC Registry absent prior express written

consent;

c.      Defendants' violations of the TCPA; and

d.      The availability of statutory penalties.

77.    A class action is superior to all other available methods for the fair

and efficient adjudication of this matter.

78.    If brought and prosecuted individually, the claims of the members of

the Class would require proof of the same material and substantive facts.

79.    The pursuit of separate actions by individual members of the Class

would, as a practical matter, be dispositive of the interests of other members of the

Class, and could substantially impair or impede their ability to protect their

interests.

80.    The pursuit of separate actions by individual members of the Class

could create a risk of inconsistent or varying adjudications, which might establish

incompatible standards of conduct for Defendants.

81.    These varying adjudications and incompatible standards of conduct,

in connection with presentation of the same essential facts, proof, and legal

theories, could also create and allow the existence of inconsistent and incompatible

rights within the Class.

82.    The damages suffered by the individual member of the Class may be

relatively small, thus, the expense and burden to litigate each of their claims individually make it difficult for the members of the Class to redress the wrongs done to them.

83.     The pursuit of Plaintiff's claims, and the claims of the members of the Class, in one forum will achieve efficiency and promote judicial economy.

84.     There will be no extraordinary difficulty in the management of this action as a class action.

85.     Defendants acted or refused to act on grounds generally applicable to the members of the Class, making final declaratory or injunctive relief appropriate.

**Count I**
**Violation of 47 U.S.C. § 227(c)(5)**
**On behalf of the Class**

86.     Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1-85.

87.     A text message is a "call" as defined by the TCPA. *See, e.g.*, *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 280 n.4 (2d Cir. 2020) ("It is undisputed that '[a] text message to a cellular telephone . . . qualifies as a 'call' within the compass of [the TCPA.'") (internal citation omitted); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).

88.     The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a]

residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

89.     Section 64.1200(e) provides that §§ 64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers."

90.     Any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" may bring a private action based on a violation of those regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c).

91.     ROI violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiff and the class members who registered their respective cellular or residential telephone numbers with the DNC Registry, which is a listing of persons who do not wish to receive telephone solicitations that is maintained by the federal government.

92.     ROI violated 47 U.S.C. § 227(c)(5) because it delivered, or caused to be delivered, to Plaintiff and members of the Class, more than one solicitation call or text message in a 12-month period in violation of 47 C.F.R. § 64.1200.

93.    Additionally, as the manager, operator, and owner of ROI, and given that Mr. Larson personally handles purchase and sale transactions tied to ROI's real estate telemarketing campaigns, and purports to be the sender of the text messages at issue, Mr. Larson directed and controlled ROI's decision to deliver telemarketing text messages to Plaintiff's cellular telephone number without prior express written consent, and despite its registry on the DNC Registry.

94.    As a result of Defendants' violations of 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200, Plaintiff, and the members of the Class, are entitled to damages in an amount to be proven at trial.

### Prayer for Relief

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action;

b.    Designating Plaintiff as the class representative for the Class under Federal Rule of Civil Procedure 23;

c.    Designating Plaintiff's counsel as class counsel under Federal Rule of Civil Procedure 23;

d.    Adjudging and declaring that Defendants violated 47 U.S.C. § 227(c)(5);

e.    Enjoining Defendants from continuing their violative behavior, including continuing to deliver solicitation text messages to

telephone numbers registered with the DNC Registry for at least thirty days;

f.    Awarding Plaintiff and the members of the Class damages under 47 U.S.C. § 227(c)(5)(B);

g.    Awarding Plaintiff and the members of the Class treble damages under 47 U.S.C. § 227(c)(5)(C);

h.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses under Rule 23 of the Federal Rules of Civil Procedure;

i.    Awarding Plaintiff and the members of the Class any pre-judgment and post-judgment interest as may be allowed under the law; and

j.    Awarding such other and further relief as the Court may deem just and proper.

### Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all triable issues.

Date: May 16, 2025.      */s/ Alex D. Kruzyk*
                         Alex D. Kruzyk (TX Bar No. 24117430)
                         **PARDELL, KRUZYK & GIRIBALDO, PLLC**
                         7500 Rialto Blvd., Suite 1-250
                         Austin, Texas 78735
                         Tel: (561) 726-8444

Fax: (877) 453-8003
akruzyk@pkglegal.com

*Counsel for Plaintiff and the proposed class*

Ronald S. Weiss (P48762)
7035 Orchard Lake Road, Suite 350
West Bloomfield, MI 48322
Tel: (248) 737-8000
Fax: (248) 737-8003
Ron@RonWeissAttorney.com

*Local Counsel for Plaintiff and the
proposed class*